SOUTHERN PACIFIC COMPANY v. MINNIE WINTON ET AL.

Decided December 11, 1901.

**1.—Appeal—Record—Affidavits.**

The appellate court will not consider affidavits and a certificate of the clerk of the trial court, not forming a part of the record, and offered to show a mistake in the record as to the date of certain orders in the case made by the court below.

**2.—Transfer of Case—Record.**

Where a case is transferred for trial from one district court to another, the order of transfer and the proceedings had in former court, certified by the clerk thereof, constitute a part of the record of the case in the latter court.

**3.—Same—Jurisdiction—Waiver—Appearance Without Citation.**

Where plaintiff filed in the court to which he supposed the case had been transferred an amended original petition for the same cause of action, this was equivalent to the institution of a suit in the latter court for the same subject matter, and the defendants having appeared in the case generally and without citation, the court had jurisdiction to try the cause, and objections to its jurisdiction not made there by defendants are held to have been waived.

4.—Assignment of Claim for Damages—Action for Death.

A surviving widow's cause of action for negligence resulting in the death of her husband is not assignable before suit brought thereon. Revised Statutes, articles 3025, 4647, construed.

5.—Same—Intervention—Claim of Attorneys.

Where attorneys performed services in prosecuting a wife's claims for damages resulting from negligently causing the death of her husband, their claim for compensation for the services is not such an interest in her cause of action as will authorize them to intervene in a suit by her for the damages.

6.—Railroads—Negligence—Car Couplings.

Where a railway company starts a train over its road having cars therein with coupling appliances so mismatched as to be dangerous to the lives of brakemen while coupling them, and a brakeman is killed in attempting to couple such cars, the company is liable for such negligence as the proximate cause of the injury.

7.—Same—Rules—Shifting Liability.

Nor could the company shift its duty of inspection and of starting out only cars equipped with proper couplings by making a rule forbidding brakemen to put cars into a train with dangerous couplings.

8.—Same—Cars Received from Foreign Roads.

Negligence of the railway company in not inspecting the cars and seeing that they were provided with safe couplings before ordering the brakeman to couple them is not excused by the fact that the cars were part of a through train belonging to another road and then being carried over defendant's road.

9.—Same—Assumed Risk.

The brakeman did not assume the risk because the danger in connecting the mismatched car couplings was discernible and became known to him while he was attempting to make the coupling in obedience to orders to do so.

10.—Same—Presumption of Safe Appliances—Warning.

Where a freight brakeman, not shown to have been familiar with the various kinds of car couplings, was ordered to couple certain tourist cars belonging to a through passenger train from another road, he had the right to presume that the coupling appliances were reasonably safe, and that he would be warned if there was extra or unusual hazard.

11.—Practice—Conflicting Evidence—Directing Verdict.

It becomes the duty of the court to instruct a verdict for the defendant only where it is so clearly established from the undisputed evidence as to admit of no other reasonable conclusion either that a fact essential to plaintiff's action had not been proven, or that one which is a complete defense has been shown.

12.—Action for Death—Amount of Damages—Excessive Verdict—Mother and Son.

Where in an action by a mother for damages for negligently causing the death of her married son, it is shown that the mother is 73 years old and living with a married daughter, and that the son contributed only about $50 per year to her support, a verdict in her favor for more than $1000 is held excessive.

Appeal from El Paso. Tried below before Hon. A. M. Walthall.

*Beall & Kemp,* for appellant.

*W. B. Brack, Edwards & Edwards, W. M. Peticolas,* and *Patterson & Buckler,* for appellees.

NEILL, Associate Justice.—This suit was brought by Minnie Winton, as surviving wife. and Annie H. Winton as the mother, of Benjamin

S. Winton, against appellant and the Galveston, Harrisburg & San Antonio Railway Company to recover damages occasioned by the death of Benjamin, who was alleged to have been killed by the defendant's negligence, when in the employ of appellant as a brakeman and while attempting to couple two passenger cars equipped with mismatched couplers—one a Miller hook and the other a Janney coupler.

The defendants answered by general demurrer, a plea of not guilty, and pleaded specially, assumed risks; contributory negligence; disobedience by decedent to rules of the company; that the cars between which he was killed came beyond the State of Texas and appellant was obliged by the laws of the State to receive and transport them without delay, and that it was a part of the duty of decedent's employment to inspect such cars and report any imperfections or defects therein.

Messrs. Patterson & Wallace, attorneys at law, claiming an interest in plaintiff's cause of action, through contract with Minnie Winton authorizing them to sue for plaintiffs on this cause of action and agreeing to give them one-half of the recovery, intervened in this suit. The court having sustained exceptions made by plaintiffs to the petition of intervention, the defendants, by a trial amendment in the nature of an interpleader, prayed to be protected against the claim of interveners, and asked that they be retained as parties. However, the petition of intervention was dismissed.

The case was tried before a jury, whom the court peremptorily instructed to return a verdict in favor of the Galveston, Harrisburg & San Antonio Railway Company, and submitted the case on the law and facts against the appellant only, against whom a verdict was returned in favor of Minnie Winton for $10,500, and in favor of Annie H. Winton for $2500. From the judgment entered on this verdict the Southern Pacific company has appealed. Messrs. Patterson & Wallace have also appealed from the judgment dismissing their petition in intervention.

Before considering the questions of fact or law arising from the trial, we will first determine a preliminary question of jurisdiction, and then dispose of interveners' appeal. There are two district courts for El Paso County,—the Thirty-fourth and Forty-first judicial districts. This suit was originally instituted in the Thirty-fourth district, and on April 20th it was transferred to the Forty-first. On June 30, 1900, it was retransferred to the Thirty-fourth. On November 15, 1900, it was again transferred to the Forty-first, where, on the 10th day of January, 1901, the case was tried, and, on the court's announcing after argument that it would instruct a verdict for defendants, the plaintiffs took a nonsuit, and judgment of nonsuit was entered. On February _15th, 1901,_ the Forty-first district court, on motion of plaintiffs, transferred the case to the Thirty-fourth district, and on February _18, 1901,_ the Forty-first district court set aside its judgment of nonsuit. The case was afterwards, on the 27th of May, 1901, tried in the Thirty-fourth district, when the judgment appealed from was rendered.

The appellant, upon these matters shown from the record, by its first

assignment of error complains that "the court erred in hearing the cause and in rendering judgment therein, as said court was without jurisdiction and its proceedings and judgment are void."

In passing upon· the question raised by this assignment we can only consider such matters as are disclosed by the record. This requires us to exclude from our consideration, as being no part of the record, the affidavit of appellees' counsel and certificate of the clerk, made after the appeal was perfected, and filed for the first time in this court, to the effect that the record does not speak the truth, and that *in fact* the order transferring the cause to the Thirty-fourth district was made after the one setting aside the judgment of nonsuit. If there were a mistake in the record of the court as to the respective dates of these orders it should have been corrected, on motion, in that court. Its records as disclosed by the transcript import to us absolute verity. It is for the district court,—not an appellate tribunal,—to correct a mistake in its minutes. We have no authority of law to consider papers filed in this court for the purpose of contradicting the minutes of the court from which an appeal is prosecuted, or of the court from which the cause was transferred to the one which rendered the judgment. Nor can we agree with appellees' counsel in the assertion that the orders of transfer made by the Forty-first district are no part of the record and can not be considered on this appeal. If this were so, there would be no means of showing, after a case had once been transferred from the court wherein it was originally instituted to the other district court, how it ever got back on the docket of the court which made the first transfer. When a case is transferred, all the orders and proceedings of the court making the transfer are certified by the clerk and are transmitted together with the original papers in the case to the court to which the transfer is made, and become ipso facto a part of the record in the cause.

Looking alone to the record for the purpose of determining this question of jurisdiction, we find that on the 15th day of May, 1901, after the date of the last order of transfer to the Thirty-fourth Judicial District and of the order setting aside the judgment of nonsuit, the plaintiffs filed in the court of the Thirty-fourth Judicial District their "second amended original petition" in this cause, and that on the 23d day of the same month the interveners likewise filed in said court their "second amended plea in intervention." No citation on either of these petitions was issued to the defendants after the nonsuit was entered, nor did either of them up to the date of the trial appear or file any pleading or any other paper in the cause. The judgment of nonsuit did not destroy nor bar plaintiff's cause of action. After it was entered they had the right to renew their suit in any court having jurisdiction of the subject matter and person of the parties. It can not be contended that the court of the Thirty-fourth Judicial District did not have this jurisdiction. If, then, it should be conceded that the order of February 15, 1901, was inoperative because of the existence of the judgment of nonsuit, and that therefore this cause was not transferred from the Forty-

first district, it would follow that, as the so-called "second amended original petition" stated the cause of action of which the Thirty-fourth district court had jurisdiction, it was the institution in that court of a suit against the defendants upon the same subject matter involved in the old suit pending in the court of the Forty-first Judicial District. In that event there would be a suit between the same parties plaintiffs and defendants, as well as interveners, involving the same subject matter pending in each of the district courts; for if the order of February 15th did not operate to transfer the case from the Forty-first district, that court had jurisdiction, to set aside, as it did on the 18th of February, 1901, the judgment of nonsuit theretofore entered, which would leave the suit pending in that court. The styling the petition, filed on the 15th of May, 1901, in the court of the Thirty-fourth district court, "second amended original petition," would not prevent it from operating as the institution of a suit in that court. Then, there being pending in two different courts of competent jurisdiction, the same cause of action between the same parties,—there being no plea of abatement filed in either,—the plaintiffs could elect which they would try, and the trial of one to final judgment would necessarily abate the other. But it may be said by the defendants that neither of them were cited or answered in the case. They each, however, did appear, as is shown by the record before us, in court upon the trial, introduced evidence, asked special instructions, their counsel argued their cause to the court and jury, and the appellant filed a motion for a new trial in which no complaint was made of the court's jurisdiction. The court having jurisdiction of the subject matter, this appearance and participation in the trial gave the court jurisdiction of their persons. Logically, it would be so much the worse for appellant that it had filed no answer to the petition of plaintiffs, filed on the 15th day of May, 1901, upon which the case was tried. For if appellant is right in its contention that the cause had never been transferred from the Forty-first district court, its answer was *there;* and having none in the court where the case was tried, it was not entitled upon the trial to be heard upon any question except the quantum of damages, and could not assign error on, nor have this court review, any other matter. But this cold, logical sequence is not advanced nor insisted upon by appellees; nor are we inclined to apply it to appellant on this appeal. Having appeared upon the trial, and (without objection of appellees) availed itself of all the defensive matters set up in its answer in the suit which it claims was never transferred from the court of the Forty-first to the Thirty-fourth Judicial District, we hold that it waived all questions of jurisdiction which might otherwise arise from the ineffectual order of transfer made by the court of the Forty-first district on the 15th of February, 1901, and can not for the first time be heard in this court to say that the case was not properly transferred from the Forty-first to the Thirty-fourth Judicial District. Kempner v. Heidenheimer, 63 Texas, 304; Andrews v. Beck, 23 Texas, 455.

The interveners, Messrs. Patterson & Wallace, assign as error the action of the court in striking out, on motion of appellees, their petition in intervention. It will be seen from our statement of the case that interveners alleged in their petition that appellee, Minnie Winton, entered into a written contract with them, as attorneys at law, whereby she, in consideration of legal services to be rendered in instituting and prosecuting suit against defendants for damages occasioned by the death of B. S. Winton, assigned them one-half of her cause of action for the death of her said husband; and that in making said contract all the formalities of law required were complied with, save that it was entered into before suit was filed. They set up a partial performance of their part of the contract; their ability and willingness to fully perform it; the value of the service performed; that they were, without cause, discharged from their employment by Minnie Winton, and that she is insolvent. They prayed that, in event they were not entitled to recover on the contract, for judgment for the value of their services rendered.

To entitle one to intervene in an action the interest claimed by him must be in the *subject matter* in the suit, and not in some incidental or collateral matter. The subject matter, when interveners came into this suit, was the damages plaintiffs were entitled to recover against the appellant for injuries by it inflicted resulting in the death of B. S. Winton. Their cause of action, if any they had, against Mrs. Winton was for a breach of contract, and if it bore any relation at all to the subject matter involved in appellees' action against appellant, it was only incidental or collateral. If they had any cause of action against appellant it must necessarily have arisen from the alleged assignments by Mrs. Winton to them of one-half of her cause of action against it for the death of her husband; for it can not be successfully contended that the Southern Pacific Company would be liable to interveners on a quantum meruit for services rendered by them in instituting and prosecuting a suit against it upon a contract between interveners and Mrs. Winton. However meritorious, so far as plaintiffs are concerned, such services may have been, we apprehend that appellant could see as little merit in as it received value from them. Things in action which do not pass to the personal representatives of a decedent as assets of his estate, in the absence of a statute authorizing their assignment, are not assignable. Pom. Eq., sec. 1275. Until the Act of 1895 (Revised Statutes, article 3353a), "in all cases of injuries to the person, whether by assault, battery, false imprisonment, slander or otherwise, if either the party who received or committed the injury died, no action could be supported either by or against the executors or other personal representatives." Tanney v. Edwards, 27 Texas, 225. The act referred to provides that causes of action brought by the injured party for personal injuries other than those resulting in death, whether such injuries be to the health or to the reputation or person of the injured party, shall not abate by reason of his death, nor by reason of the death of the person against whom such action shall have accrued. It is thus seen that at the

time of this enactment it was recognized by the Legislature that actions for personal injuries resulting in death did not survive, and that the statute expressly excepts such causes of action from its operation. An action of this character is for the sole benefit of the parties to whom the right is given, and it is expressly provided that "the amount recovered therein shall not be liable for the debts of the deceased" (Revised Statutes, article 3021), and that "if the sole plaintiff die pending the suit, and he is the only party entitled to the money recovered, the suit shall abate." Rev. Stats., art. 3025. But it would seem that Revised Statutes, article 3647, which provides for the "sale of a judgment or any part thereof of any court of record within this State, or the sale of any cause of action or interest therein after suit has been filed thereon," when evidenced, acknowledged, filed, and a minute of such transfer made, as required by the article, is applicable "to any judgments, suits, claims, or causes of action, whether assignable in law or equity or not." It, however, does not apply to the sale of a cause of action before suit is brought. Railway v. Wooten, 10 Texas Civ. App., 54. We conclude, therefore, that it appears from the face of intervenors' petition that they have no interest in the subject matter of this suit, and that the court did not err in striking their pleading from the record and dismissing their alleged cause of action.

This brings us to the consideration of the case upon its merits. Under appellant's second assignment of error it is contended that the court erred in submitting the case to the jury, under the facts, and in charging that under any phase of the evidence plaintiffs were entitled to a recovery. This requires a consideration of the facts and the law applicable to them. We will therefore state the facts, and such as are undisputed may be considered as our conclusions. But when the evidence raises an issue as to the existence or nonexistence of a material fact, we will, after considering the testimony, determine the issue in accordance with the verdict, if we find the evidence reasonably sufficient to support it.

On the 25th day of September, 1899, a train loaded with negro soldiers, destined for the Pacific coast, came from some point beyond the State of Texas over the line of the Texas & Pacific Railway Company, and was received from that company by the Southern Pacific Company at its depot in the city of El Paso, Texas, to be carried over its road west to its destination. The cars composing the train were tourist sleepers. While waiting at El Paso the train was cut in two at a certain street crossing. When the time came for the train to depart on its journey west, the conductor directed Benjamin S. Winton, who had on that day been taken by appellant from his employment as a brakeman on its freight trains and assigned to duty as a brakeman on this passenger train, to couple the cars at the crossing where it had been cut in two. In obedience to the order of the conductor he made the coupling, when, by reason of the coupling appliances being mismatched,— one being a Miller hook and the other a Janney coupler,—they slipped

by each other before he could get out from between the cars, and by their coming together he was crushed so that he died soon thereafter. Each of the couplers was automatic when worked with its own kind. When they were used together they would not couple automatically, but could be coupled by the use of a link and pin. When coupled by these means, as they were in this instance, their tendency, on account of the lateral motion in the Miller hook, was to slip by each other and allow the ends of the cars or their platforms to come so close together as to endanger the life of anyone between them. It is generally recognized among railroad men that the use of these kinds of coupling appliances together is dangerous. The accident happened in the daytime, when the kind and character of the coupling appliances could be plainly seen.

The deceased was an experienced brakeman, 35 years old, and had worked for the Southern Pacific Company, as a brakeman on its freight trains, about a year and a half before his death. Prior to his employment by appellant he had worked for the Santa Fe system in Southern California for about two years, on passenger trains the greater part of the time.

Rules 59 and 60 of appellant company are as follows: "Great care must be exercised by all persons when coupling cars. Inasmuch as the couplings of cars and engines can not be uniform in style or strength and are apt to be broken from various causes so as to render it dangerous to expose the hands, arms, or person of those engaged in making couplings, all employes are *enjoined,* before coupling cars or engines, to examine and to know the kind and condition of drawhead, drawbar, link and coupling apparatus, and are forbidden to place in trains any car with a defective coupling, until they shall have reported the defect to the conductor or yardmaster. Sufficient time may be taken by employes in all cases to make the examination required.

"In coupling Miller hooks with other styles of drawbars, the link should first be inserted to the hook, using the pin chained to the Miller platform. In coupling a Miller hook with link and pin to an automatic coupler, the link should first be inserted in the hook; then the coupling be made to the closed knuckle of the automatic coupler. The person making the coupling as a rule should stand on the guard arm side of the automatic coupler."

We conclude and find as a fact that appellant was negligent in having in said train the two coaches, one of which was equipped with what is known as a "Miller hook" and the other with a "Janney coupler," and that such negligence was the proximate cause of the death of Benjamin S. Winton.

The issues of fact (1) as to whether decedent knew, or by ordinary observation could have known, when he went between the coaches to make the coupling that the lateral motion in the Miller hook was sufficient to allow it to slip past the Janney coupler and subject him to anusual danger, and (2) whether in making the coupling he observed the rule of the company prescribing the manner in which it should be

done, are controverted, and upon them the evidence was conflicting. There was, however, evidence upon each of said issues sufficient to warrant the jury in finding that decedent did not know, and by ordinary observation could not have known of the liability of the Miller hook to pass the Janney coupler. As to the second issue stated, we think it is demonstrable from the evidence that the decedent obeyed to the letter the rule of the company in making the coupling. In view of the verdict, we find on each of the issues of fact in accordance therewith.

Having found (1) that appellant was negligent in having the two cars in its train with mismatched coupling appliances; (2) that such negligence was the proximate cause of Winton's death; (3) that the risk attending one in coupling such cars was unusual; (4) that the decedent was unacquainted with and could not by ordinary observation have known of unusual danger caused by the liability of the mismatched coupling appliances to pass each other; and (5) that in making the coupling Winton complied with the rule of the company in making it,—we are brought to the question raised by this assignment: "Did the court err in submitting the case to the jury on these facts?" This question requires us to consider the law upon (1) negligence of appellant; (2) on assumed risk; and (3) upon contributory negligence.

1. It is the duty of the master to use ordinary care, diligence, and skill for the purpose of protecting his servants from encountering unnecessary risks in his service. He personally owes to his servants the duty of using ordinary care and diligence to provide for their use reasonably safe instrumentalities of service. These instrumentalities must be adapted to the work in hand. It is not enough that they should be good under ordinary conditions; but they must be suitable for the work to which they are applied by the master, and properly *adjusted* to each other. If, therefore, the master knows or would have known if he had used ordinary care to ascertain the facts, that the machinery or appliances which he provides for the use of his servants are unsafe, and a servant without contributory fault suffers injury thereby, the master is liable therefor. The master is not entitled to time to discover defects in things which are defective when put to use, but he should examine them before putting them to use. He can not evade his responsibility in these respects by simply giving general orders that servants shall examine for themselves, before using the appliances furnished by him. Shearm. & Redf. on Neg., 5 ed., sec. 194, and authorities cited in notes. Railroad companies owe to their employes the duty of proper inspection of cars and their appliances for the purpose of discovering defects. If the appliances are not reasonably safe or proper on any of the cars, they should not be put in the train and started out. And it makes no difference whether the cars belong to the company or were received by it from some other railroad; they must first be inspected, and if found unsafe, must not be put in the train. As is said in Gottlieb v. Railway, 100 New York, 462, 3 Northeastern Reporter, 344, "it [the railroad company] owes the duty of inspection as master,

and is at least responsible for the consequences of such defects as would be disclosed or discovered by ordinary inspection. When cars come to it which have defects visible or discoverable by ordinary inspection, it must remedy such defects, or refuse to take such cars; so much, at least, is due from it to the employes. The employes can no more be said to assume the risks of such defects in foreign cars than in cars belonging to the company. As to such defects the duty of the company is the same as to all cars drawn over its road."

As the evidence shows without contradiction that the appellant knew when it received the train carrying the two cars with mismatched coupling apparatus it was extra hazardous to its employes to couple them together, it was guilty of a breach of duty to its servants. As is seen, it could not under the law shift the consequence of its negligence from itself to its servants, as it claims in this case it had done, by a rule imposing upon its servants a duty it personally owed to secure their safety while in the discharge of the duties of their employment. Even if the master were permitted in this way to shirk his duty and avoid the consequence of his negligence, the rule of the company, forbidding its employes to place in trains any cars with defective couplings, can not be held in this case to have that effect. It was not the decedent's duty to place cars in trains; this duty was appellant's, or such of its servants to whom it had been delegated by the company, and whose failure to discharge it would, as to all employes except themselves, be the negligence of the master. The cars had been placed in the train before Winton was assigned to it in the capacity of a brakeman. The train might have been hauled over appellant's entire line without it becoming necessary for a brakeman either to couple or uncouple any of the cars had it not been cut in two at the street crossing in El Paso. Because of its being parted there, the brakeman who had to make the coupling so it could proceed on its journey can not be held to the liability of a servant whom appellant had "forbidden to place in trains any car with defective couplings." These principles of law when applied to the facts show to a moral certainty the negligence of appellant.

2. As to the doctrine of assumed risks: "A servant is held to assume the ordinary risks of the business upon which he enters, so far as those risks, at the time of entering upon the business, are known to him, or should be readily discernible by a person of his age and capacity, in the exercise of ordinary care, and whether the business is dangerous or not. The ordinary risks of a particular business are those which are a part of the ordinary method of conducting that business, even though they might be fairly called extraordinary with reference to different business, or a different department of the same business. If the business is essentially attended with extraordinary dangers, these are among the risks assumed." Joyce v. Worcester, 140 Mass., 245, 4 N. E. Rep., 565. But a servant does not assume risks which are not thus known or discernible, nor any which do not exist at the time when he enters into his master's service, and of which he has not notice im-

time to protect himself against them, nor does he assume extraordinary risks, unusual in his business, of which he has not timely notice." Shearm & Redf. on Neg., secs. 185, 185a. "'He does not assume the risks arising from the failure of the master to do his duty, unless he knows of the faiure and the attendant risks, or in the ordinary discharge of his duty must necessarily have acquired that knowledge." Railway v. Hannig, 91 Texas, 347, 43 S. W. Rep., 408. A servant has the right to presume, and to act upon the presumption, that his master or his vice-principal has and will continue to perform every duty incumbent upon him; that there are no risks attending the business other than such as usually attend business of that general nature, and existed when he entered into the service, or such as have been explained to him, or are known by or perfectly obvious to him; that it is safe to obey orders; that the place of work is safe and the appliances reasonably good and adequate. Shearm. & Redf. on Neg., sec. 185b. When the master has been guilty of negligence, knowledge on the part of the servant of such negligence and of the danger arising therefrom is the foundation of assumed risk. Railway v. Engelhorn, 62 S. W. Rep., 561. If it be admitted the decedent saw, at the instant he attempted to make the coupling, the dissimilarity between the couplings, that would not give rise to the doctrine of assumed risk; for if he acquired that knowledge at the time he attempted to make the coupling, the doctrine of assumed risk does not apply. Railway v. Milam, 20 Texas Civ. App., 688. The rule prescribing how the coupling should be made when "coupling Miller hooks with other styles of drawbars" would imply that if the coupling were made in compliance with the rule no extraordinary risk would be encountered. A servant upon whom the duty devolved of performing the service would have the right to presume that his master knew it was safe if done in 'the manner prescribed. If making the coupling according to the rule of his instruction would expose him to unusual danger, it was the company's duty to inform him of the extra hazard. The decedent was not bound to know what was unusual and not to be expected in the usual course of his employment. Kerns v. Railway, 62 N. W. Rep., 502.

The decedent's employment was that of a brakeman on freight trains upon which such coupling appliances as a "Miller hook" and "Janney coupler" were not ordinarily used. It does not appear that he ever made or ever saw a coupling made with such mismatched appliances. The fact that it was generally known among railroad men that making a coupling with such devices was dangerous would not, as a matter of law, impute to him knowledge of such danger. The rules furnished him provide for making such a coupling, and he was ordered by his conductor (the company's vice-principal) to make it. He had, in addition to the presumptions arising from the rule forbidding cars with defective couplings being placed in trains, and prescribing how couplings should be made with a Miller hook, that he was not exposing himself to

unusual danger, the right to assume that the conductor would not order him to make the coupling if the appliances were unsafe. It not appearing that Winton knew, or by the exercise of ordinary observation ought to have known, that the lateral motion of the Miller hook was sufficient to permit it to slip by the Janney coupler, it can not be said he assumed the risk of losing his life in undertaking to couple the cars. Russell v. Railway, 20 N. W. Rep., 147; Martin v. Railway, 29 Pac. Rep., 645; Railway v. Smith, 57 S. W. Rep., 999. As the risk to Winton in making the coupling was one that arose from the negligence of appellant, and not such as was ordinarily incident to his employment, nor of which he had knowledge, nor readily discernible and of which he had knowledge in time to protect himself, therefore we conclude, under the law and facts, that it can not be held to be such a risk as was assumed by him.

3. Little need be said as to the contributory negligence. If one is injured in the discharge of his duty by an occurrence of which he assumed the risk of the danger, it can make little difference whether he was negligent in the performance of the duty or not. In either event he is not entitled to recovery. If the injury results from a risk which was not assumed, but from his contributory negligence, he can not recover, though his employe may have also been guilty of negligence. The only ground upon which it is possible to say that decedent was guilty of contributory negligence is that he did not obey the rule of the company as to the manner of making the coupling. Upon this point we have found that it is demonstrable from the testimony that in this he observed the rule to the letter. We must therefore hold that he was not guilty of any negligence proximately contributing to his death.

It follows from what we have said that the court did not err in submitting the case to the jury on the facts. It is only when it is so clearly established from the undisputed testimony as to admit of no other reasonable hypothesis or conclusion that either a fact essential to plaintiff's action is not proven, or one which is a complete defense has been shown, that it becomes the duty of the court to instruct a verdict for the defendant. Sanches v. Railway, 88 Texas, 117, 30 S. W. Rep., 431; Railway v. Ryon, 80 Texas, 59, 15 S. W. Rep., 588; McDonald v. Railway, 86 Texas, 1, 22 S. W. Rep., 939; Choate v. Railway, 90 Texas, 88; Haass v. Railway, 24 Texas Civ. App., 135.

All of the questions raised in the assignments which complain of the charge, except one, are involved in what we have already stated to be the law applicable to the facts in this case. The charge is in perfect accord with our view of the law as before expressed, and we deem it unnecessary to say more than that in our opinion none of such assignments, as well as none of those which complain of the court's refusal to give certain special instructions requested by appellant, is well taken.

As the charge shows that the only issues of negligence submitted to the jury were (1) whether appellant was guilty of negligence in using a Miller hook in connection with a Janney coupler, (2) whether or not

it was negligent in failing to inform deceased of the unusual danger in making the coupling, and (3) whether Winton was guilty of contributory negligence, the appellant could not have been prejudiced by the court's telling the jury in its charge that before they could find for plaintiffs they must find that decedent's "injury was caused through the negligence of the defendant in some one of the respects above named,"— i. e., some one of the grounds of negligence alleged in plaintiffs' petition. When the charge is considered as a whole the jury were only permitted the consider or find against appellant upon one or both of the grounds of negligence submitted to them.

The evidence shows that Annie H. Winton, the mother of the deceased, was 73 years old when the depositions were taken in the case; that her life expectancy was seven years; that he gave her about an average of $50 a year; that she resided with her daughter, Cora Caswell, in California, at the time of his death; that Mrs. Caswell and another married daughter contributed to her support by giving her a home. Deceased was earning $100 per month when he was killed. In May, 1899, he spoke of his intention to care for his mother the remainder of his life, saying that he wanted her to live with him and take life easy; that theretofore he didn't have money to do for her as he liked, "but now [May, 1899] he was out of debt, making money and able to support her."

Had deceased contributed one-third of his earnings during her life expectancy it would have amounted to little more than the judgment. She already had a home with her daughter, and it is not shown that she ever intended to change it for a home with her son. There is nothing to show that she had any reasonable expectation of receiving pecuniary aid of more than $1000 in value from her son had he lived. That sum we believe will amply compensate her for the pecuniary loss she has sustained.

We do not believe the damages awarded Minnie Winton, the wife of deceased are excessive.

If within fifteen days from this date a remittitur is entered by Mrs. Annie H. Winton of $1500, the judgment will be affirmed, otherwise it will be reversed and the cause remanded.

*Affirmed on remittitur.*

Writ or error refused.