## THE ADEN MARU.

## LUMBERMEN'S RECIPROCAL ASS'N et al. v. KOKUSAI KISEN KABUSHIKI KAISHA.

### No. 1386.

District Court, S. D. Texas, Galveston Division. July 29, 1931.

Harris & Watkins, of Galveston, Tex., for libelants.

Hunt Hill & Betts, of New York City, and Lockhart, Hughes & Lockhart, of Galveston, Tex., for respondents.

HUTCHESON, Circuit Judge.

This case as first filed presented an effort on the part of Culver, an injured employee of Young & Suderman, independently contracting stevedores, and their insurer, under the Longshoremen's and Harbor Workers' Compensation Act (33 USCA §§ 901–950), to sue as "persons other than the employer liable for damages" the owner of the ship Jufuku Maru, and the ship in the course of the loading of which the injury was received.

A hearing on exceptions to their right to sue them as third persons resulted in an order overruling the contention that the ship and owners were not third parties, sustaining the exception as to Culver's right to sue, and

because the insurer had procured an assignment from the insured, the statutory assignee of Culver's right of action, sustaining the insurer's right to sue. So. Pac. Co. v. Winton, 27 Tex. Civ. App. 503, 66 S. W. 477; see Culver's Case (D. C.) 1930 A. M. C. 1791, 44 F.(2d) 659.

The case afterward coming on for trial on its merits; respondents, renewing their contention that the ship was not a third party, proved that, though Young & Suderman had taken out the insurance required by the act for the protection of its employees, the ship had paid to them, as part of the cost of the loading, the amount of the premiums.

They argued from this, and from the statute making it the duty of the ship to let the work only to contractors who had taken out insurance, that the ship must be treated as a statutory employee and itself protected by the insurance and not as a third party, a stranger to the insurance arrangement.

Cases are cited from states having statutes designed and effective to treat an entire undertaking as a unit and to provide that persons working on it shall have as to all persons working on it, or connected with it, one remedy, that for compensation.

The effect of these statutes is to release all other persons working on or connected with the undertaking from their common-law liability for damages for injuries which they cause. In Standard Accident Ins. Co. v. Pennsylvania Car Co. (C. C. A.) 49 F.(2d) 73, 75, these cases are referred to, but not followed, for the reason that there, as here, the statute under construction was different from those considered in the cited cases. For the same reason they will be referred to, but not followed here. There, under a statute (Rev. St. Tex. 1925, art. 8307, § 6a) which, while giving a cause of action against "person other than the subscriber," provided (article 8306, § 3) that the employees should have "no right of action against their employer or against any agent, servant, or employee of said employer," we held an independent contractor liable in damages to the employees of the contractor. Here the statute provides (section 4 of the act [33 USCA § 904]): "Every employer shall be liable for and shall secure the payment to his employees of the compensation" provided by the act (section 5 [33 USCA § 905]): "The liability of an employer prescribed by the act shall be exclusive and in place of all other liability of such employer to the employee." Section 33 of the act (33 USCA § 933) provides that,

if the employee determines that "some person other than the employer is liable in damages," he may elect compensation or suit for damages against such third person, and that acceptance of compensation shall operate as an assignment to the employer of all right of the employee to recover damages against such third person, subject only to the requirement that, if the employer recover any excess over his disbursements, he shall pay them to the employee. This statute vests in the employer complete control over the cause of action. Hunt v. Bank Line (C. C. A.) 35 F.(2d) 136.

■ I think it plain that, just as the independent contractor in the Standard Accident Case, supra, was under the Texas statute a "person other than the subscriber," and therefore liable to suit, so here, under the Federal statute, if there is liability on the ship and its owners, the statutory case of "some person other than the employer is liable in damages" is presented, and ship and owner are suable; for under no reasonable view of the statute in the light afforded by its language considered alone, or in the light of the purpose to be accomplished by it, the mischief to be remedied, can it be considered that the ship or its owner was Culver's "employer." I therefore adhere to the rulings made on exceptions to the libel, holding with the libelants that it may sue on the cause of action alleged. See The Pacific Pine (D. C.) 31 F.(2d) 152.

On the merits, however, I think the decision must be for respondents.

In a case of this kind, where the employer was unquestionably negligent in the way the work was performed, and where, nearly a year after the injury occurred, for the first time, claim is made that the ship caused the injury, libelants should be prepared, not merely to suggest that the ship may have been negligent, and that its negligence may have been the proximate cause of the injury, but to clearly and satisfactorily establish that it was negligent, and that that negligence was a proximate cause.

■ Respondents insist that the testimony of Jure, generally in charge of the loading for Young & Suderman, that the winch worked all right, and loaded cargo properly, that he saw nothing the matter with it, and that no complaints of anything being wrong with it were made to him, taken in connection with the testimony of the ship's officers that as to the winch there was nothing wrong with it, and as to the bolts for the beam they were available and used, in the light of the con-

cededly dangerous and reckless method employed in getting the bale of cotton out of the hold by dragging the fall across the beam, instead of topping the boom, rebuts the claim of libelants' witnesses that the winch was defective, and that they were unable to secure bolts for the beam.

I do not find it necessary to decide this point, for, assuming without deciding that the ship failed and refused to furnish bolts for the beam, it is entirely plain that everyone, including Culver, knew that the beam was not bolted; and assuming in the same way that in the particulars of leaking steam and the absence of a brake the winch was defective, and that the failure to have the winch in better condition was negligence, it is entirely clear that neither the absence of bolts, nor the condition of the winch, was the proximate cause of the injury. This occurred solely and entirely as the proximate result of the generally reckless manner in which a dangerous piece of work was being performed by attempting to drag the bale up across the beam knowing that it was bound to foul it unless some one pushed it off, instead of topping the boom for a complete clearance. And specifically because the beam upon which Culver was standing was displaced through the negligence of the gangwayman in ordering the winch to proceed ahead after Culver had signaled to him to stop it.

Libelants' counsel argue this case as though the beam was dislodged by the winch proceeding up after the gangwayman had ordered it stopped. The evidence establishes just the contrary.

Giving full effect to all of the testimony of Culver, Burroughs, Lahohn, and Garzell, libelants' witnesses to the accident, it is made crystal clear that after the bale was stopped at a point twelve or fourteen inches below the beam, and Culver had signaled to hold it until he could push the bale out from the beam, Lahohn not getting or disregarding Culver's signal attempted by go ahead orders to the winchman to maneuver the bale past the beam while Culver was leaning over in a dangerous position to push it out of engagement, and that not the failure of the winchman to obey Lahohn's "stop" order, but his obedience to Lahohn's "go ahead" order, caused the injury.

A brief summary of the evidence of these witnesses will, I think, establish this point.

As to the setting, all agree that Culver and Burroughs were stowing cotton in the 'tween decks. Lahohn was standing on the top deck where he could look down below,

giving orders to the winchman. The hatch being only partially covered, a bale rolled out of the sling into the lower hold. Without topping the boom as he should have done so as to place it directly over the center of the opening through which the bale was to come back, Lahohn ordered the winchman to drop the sling into the hold and bring up the loose bale, though he knew that on account of the position of the boom the fall would come up directly alongside of the beam, and that, unless the beam was shoved and held off, it would engage and drag the unbolted beam up with it.

As to the occurrence, all agree that when the bale started up Lahohn called out for some one to go out and shove the bale off. That Culver and Burroughs both went out to the edge of the beam to catch the fall, Culver arriving first, Burroughs turned around and started walking slowly back across the approximately eight feet of hatch. That the bale came slowly up to within twelve or fourteen inches of the beam, and that it then stopped or halted. That everybody realized that, unless the bale was pushed off, it would engage the beam. As to this stopping and the onward movement of the bale afterward, Culver testified: "He pulled the bale up within a few inches of the beam and I said to hold it. I wanted to push it out to clear the beam. I said this by holding my hand out flat; that meant to hold it. I saw the bale was going to hook the beam and wanted to go up and push it out and clear the beam. It about stopped and then it continued to go; it went oozing on up; it halted and started going slowly up and eased the beam out."

Lahohn testified: "When the bale was twelve or fourteen inches below the beam I stopped the winchman and he (Culver) held against it to clear the beam. I stopped the winchman and Culver put his hand on the fall and I gave the signal to go ahead again and she did not respond immediately when she did she could not be stopped. It was swinging slowly and the winch instead of going ahead like it should, went ahead in jerks and loosed the beam out."

Garzell testified: "For a while I crept along and when he gave me the signal to stop I stopped, and he held his hand and then he gave the signal to go ahead easy to clear the beam and then I started ahead a couple of feet and he threw his hand out and I shut the steam off, but it would not shut. After I cut off the steam as tight as I could the fall rose twelve or fourteen inches. After I got the signal to stop it went twelve or fourteen

inches." While Burroughs testified: "When I saw the bale it had come to a stop about a foot below the beam. I saw Culver put his hand on the bale. When I turned my back and started walking off I felt the hatch give a little under me. Before I got off the hatch I felt it rise. Some one on deck cried out just before the man fell, 'Stop that winch'— this was just as I was about to jump off; just a second before I started off the hatch; at that time I had felt that rising movement."

Reconstructing the picture of the accident in the light of this testimony, it appears that Culver, realizing the danger of his position standing on the edge of a beam and leaning out to push a heavy cotton bale away from its engagement of the beam, had signaled to Lahohn to stop the winch until he could push the bale out. That Lahohn either did not catch the signal, or misunderstanding it he signaled to the winchman to go ahead slowly and ease the bale out from under the beam. That the winchman did go ahead, and, after it stopped when the bale was only twelve or fourteen inches below the beam, he went two feet more, which would bring the bale up to the beam, and lifted the beam eight or ten inches, enough to take it out of its slot and cause it to fall. It was then, after the beam had been dislodged and Culver was in the act of falling, and not until then, that the gang-wayman gave the winchman the order to stop the winch, and whether in his excitement the winchman was unable to stop the winch until it went up ten or twelve inches more is wholly immaterial, the injury had already been done.

In this view, which wholly exonerates the ship, it becomes unnecessary to determine whether, if the ship had been negligent, Culver's action against it would, because of the dangerous position which he voluntarily assumed, have been defeated under the operation of the maxim volenti non fit injuria, and because of the existence of compensation it is also unnecessary to determine whether, under the contractual doctrine of assumed risk, his suit against his own employer would have been defeated.

Reduced to its simplest terms, this is a case in which a serious injury has resulted on shipboard to an employee of an independently contracting stevedore in the course of a culpably negligent and dangerous method of performing work voluntarily adopted by the employer and voluntarily participated in by the employee.

In such a case, in order to hold the ship, it must be clearly established, both that it was negligent, and that its negligence was a proximate cause of the injury. In such a case, where the evidence leaves the matter of proximate cause in doubt, it defeats the cause of action. Reading Co. v. Boyer (C. C. A.) 6 F.(2d) 185; Luckenbach v. Buzynski (C. C. A.) 19 F.(2d) 871. Where, as here, proximate cause is clearly shown to be the negligence, not of the ship, but of the employer, it is plainer still that the case against the ship must fail. Johns-Manville v. Pocker (C. C. A.) 26 F.(2d) 204.