**MIDDLETON & CO. (CANADA), LIMITED, et al. v. OCEAN DOMINION S. S. CORPORATION.**

No. 229.

Circuit Court of Appeals, Second Circuit.

Aug. 12, 1943.

Bingham, Englar, Jones & Houston, Henry N. Longley and Ezra G. Benedict Fox, all of New York City, for libellants-appellants.

Haight, Griffin, Deming & Gardner, Wharton Poor and James McKown, Jr., all of New York City, for respondent.

Before AUGUSTUS N. HAND, CHASE, and CLARK, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

This is a suit in admiralty brought on behalf of the owners of cargo of the Nor-

wegian Steamship Iristo to recover from the sub-charterer of the ship the total loss of the cargo caused by stranding on a reef off the northwest coast of Bermuda. The master mistook a wrecked steamship for a vessel under way, began to navigate in respect to her and thus got out of his course and ran on the reef. Judge Conger granted a decree for the respondent dismissing the libels and the libellants appeal. We think the decisions should be affirmed.

The Iristo was a ship built in 1919 at Lorraine, Ohio, whose owners chartered her on October 5, 1936, to Atlantic Maritime Corporation, and the latter sub-chartered her on February 2, 1937, to the respondent, Ocean Dominion Steamship Corporation. She entered service on March 3, 1937, and proceeded to Halifax, which she reached on March 8, and there loaded general cargo for Bermuda and West Indies ports. Her master sought to buy an admiralty chart of Bermuda at Halifax but nothing was available but No. 360, a small scale chart of the entire island, and No. 334, a large scale chart of the southwestern side of the island. Since he was to stop at St. John, New Brunswick, he decided not to purchase a chart at Halifax but to wait until he got to St. John where he hoped to buy No. 335, a large scale chart of the northeastern side of Bermuda along which he was proposing to navigate. On arrival at St. John on March 10, he was unable to procure Chart No. 335, but purchased No. 360 and sailed for Bermuda on March 11, 1937. At St. John he had been offered a later edition of Chart No. 360 with the wreck depicted thereon in small scale, which, however, he failed to notice when the chart was exhibited to him. Chart No. 360, which he purchased at St. John, showed on its face that it had been made in 1932 and bore neither a designation of the wreck, nor any other correction later than that year. When the Iristo sailed from St. John neither her master, nor her first or second mate, had ever before sailed to Bermuda. Because of a semi-circle of coral reefs running some eight or ten miles outside of and to the north of that island, the approaches to it presented a considerable hazard and required careful navigation.

The only chart of Bermuda on board the Iristo was the British Admiralty Chart No. 360 of a scale 1/200,000 which would have been a sufficient guide for navigation about the island if it had been corrected to date, that is, if it had contained a notation of the wreck.

There were two copies of Notice to Mariners No. 52 on board the Iristo. One had been obtained by the master at Boston and the other at Philadelphia prior to arriving at Halifax. Each read as follows:

"(3643) Bermuda Islands—North Rock Light Wreck northeastward. The wreck of a vessel, which is conspicuous, lies stranded 2.57 miles 77 degrees from North Rock Light.

"Approx. position: 32 degrees, 29 minutes N., 64 degrees, 43 minutes W."

When the master obtained the Notices to Mariners in Boston and Philadelphia, he did not know that he was to go on a voyage to Bermuda. He, therefore, paid no particular attention to the notices, but only glanced at them and did not observe the notation of the wreck. Indeed, he did not know he was to take the ship to Bermuda until he reached Halifax. Doubtless, through inadvertence, he failed to have Chart No. 360 corrected to date after leaving St. John, and relied on No. 360 as it was when approaching Bermuda.

The British Admiralty had issued a Notice to Mariners on November 28, 1936, giving full information as to the position of the wreck of the Cristobal Colon, a 24,-000 ton vessel which had gone on the reef north of Bermuda in October, 1936. On December 23, 1936, the United States Hydrographic Office at Washington, D.C., had issued its notice on which the following appeared:

"(3643) Bermuda Islands—North Rock Light—Wreck northeastward.—The wreck of a vessel, which is conspicuous, lies stranded 2.57 miles 77° from North Rock Light.

"Approx. position: 32° 29' N., 64° 43' W. (N. M. 52, 1936). (Notice to Mariners 48. (2325), Admiralty, London, 1936.) * * *"

Files of the British Admiralty and United States Hydrographic Office were available at Halifax and St. John in the Offices of the Shipping Masters and in the Clearance Offices in the Custom Houses. While the master of the Iristo was at Halifax and at St. John he or the first mate could have examined these notices; they failed to do so, apparently because after procuring Chart No. 360 they assumed it was correct to date, in spite of the fact that

it showed on its face that it was not. There can be no doubt that it was negligent of the officers of the ship not to bring the chart up to date by adding to it the information of the wreck which was available to them in the Notices to Mariners, and so the trial court found.

The master and the first and second mates were men of wide sea experience and the managing owner of the Iristo had made inquiry as to their abilities before hiring them and found their records satisfactory. There was no negligence in the selection of the officers. The negligence which caused the disaster was not that of the owner, but of the officers of the ship, who failed to bring the chart up to date when the information to do so was on board and readily obtainable.

On the trip to Bermuda, normal conditions were experienced and nothing unusual happened prior to the stranding. At noon on March 15th, as the ship neared the island, her course was directed to pass about three miles north of the North Rock Beacon. When the North Rock Beacon was sighted, the master directed a four point bearing to be taken in order to ascertain the distance of the vessel from this light. Lunderbye, the second mate, after running the distance between the two bearings, which took about ten minutes, and realizing that he was too far in toward the island, ordered the man at the wheel to turn fifteen degrees to the northward so as to put the ship on a course of eighty-five degrees east true. At about the same time the master, believing that he saw a steamer ahead (in fact only the wreck of the Cristobal Colon) and a little on the starboard bow of the Iristo, ordered the course of the Iristo to starboard, which was towards the reef. This brought the Cristobal Colon slightly on the port bow of the Iristo. It was established by the testimony and was found by the District Court that the master and the second mate thought they were approaching a large passenger steamer, believed she was under way and accordingly changed the course of the Iristo so as to pass the steamer port to port. There were no sailing directions on board containing any mention of the wreck, but, if Chart No. 360 (Exh. 10) under which the vessel was being navigated had been corrected to date, it would have disclosed the wreck and there is reason to believe that the accident would not have happened. Moreover, if the uncorrected chart had been read carefully, just as it was, the navigators would have ascertained that the change of course to starboard would land the Iristo on the reef disclosed on the map. Indeed, upon any reasonable hypothesis the acts of the master were negligent.

At about 3 p. m. the Iristo ran on the reef. Her own efforts to free herself from the reef were unavailing. About 6 p. m., however, a tug arrived, pulled her off, and attempted to tow her to port on the south side of the island, but, owing to the damage she received from running on the reef, her deck began to submerge and she had to be abandoned. The vessel and her cargo were lost, but the officers and crew escaped. After the navigator of the Iristo had sighted North Rock Beacon, he had only to keep a safe distance away from the reef until St. David's Island Light was sighted and then to proceed about nine miles southeast to the pilot station at the narrows in order to enter the harbor. If the master had been aware that the Cristobal Colon was a wreck, and had not mistaken her for a vessel under way, there can be no doubt that he would not have ordered his vessel to starboard, but would have kept on the course of 85° true and thus have passed outside of the reef. This is amply borne out by the testimony of the master at page 581 of the record. It is, therefore, plain that the cause of the stranding was his ignorance of the existence of the wreck, which a properly marked chart would have disclosed.

The District Court found that the Iristo was seaworthy and determined that the loss resulted from an act, neglect, or default in the navigation or management of the ship for which there was no liability on the part of the carrier or the ship under Art. IV 2(a) of the Rules annexed to the Canadian Water Carriage of Goods Act. It dismissed the libels for this reason and also for the reason that the bills of lading were contracts of carriage between the shipper and the shipowner and not contracts of carriage by the subcharterer, who is the respondent in this suit. Inasmuch as we are persuaded that the libellants must fail for the first reason, that is to say, because the Iristo was seaworthy, it becomes unnecessary to decide whether the respondent was the carrier, or was a mere agent of the shipowner who incurred no personal obligation for the loss.

The cargo of the Iristo was carried under the Canadian Water Carriage of Goods

Act of 1936 which, in Article IV, provides as follows:

"1. Neither the carrier nor the ship shall be liable for loss or damage arising from unseaworthiness unless caused by want of due diligence on the part of the carrier to make the ship seaworthy, and to secure that the ship is properly manned, equipped and supplied, * * *

"Whenever loss or damage has resulted from unseaworthiness, the burden of proving the exercise of due diligence shall be on the carrier or other person claiming exemption under this section.

"2. Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from,

(a) act, neglect, or default of the master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship; * * *".

▮▮ We hold that the Iristo was properly found seaworthy because of the notices on board which disclosed the existence and location of the wreck and that the failure to bring the chart up to date, or otherwise to use the information available, when navigating in the vicinity of Bermuda, was a fault "in navigation or management." This very point was involved and passed upon by the present court in United States Steel Products Co. v. American & Foreign Ins. Co., 2 Cir., 82 F.2d 752. There the "Steel Scientist" was found seaworthy, in spite of the fact that her charts had not been brought up to date, because there were records on board from which they could be readily corrected before the vessel reached the waters in which the information became necessary for proper navigation. It would seem equally foolish to hold a ship unseaworthy because her master employed a chart that had not been brought up to date, when he had a correct chart on board that he had forgotten to use, and to hold the Iristo unseaworthy because her officers employed a deficient chart when the means to correct it in good season were available.

The situation differs from that in The Schwan [1909] A. C. 450, a decision relied upon by the libellants. There the vessel was equipped with a "three way cock," of a dangerous and unusual construction, which permitted sea water to run into the hold and thereby damage the cargo unless the crew were told how to use it, and they were not told. She was, therefore, held unseaworthy and her owners liable for the cargo damage. See opinion of Hough, J., to the same effect in The Miguel Di Larrinaga, D.C., 217 F. 678, 680.

The statement of L. Hand, J., in The Elkton, 2 Cir., 49 F.2d 700, 701, that "seaworthiness may depend upon the knowledge of the ship's company as to how far she has been in fact made ready" related to the case of a hidden and broken vent pipe through which fuel oil leaked from a tank and damaged a cargo of sugar. Knowledge of the defect which existed when the vessel sailed was held not to render the vessel seaworthy. We know of no decision where the neglect of the ship's officers to perform the routine labor of examining mariners' notices so as to bring navigation charts up to date and make them safe for navigation has been imputed to the owner. The data for navigation of the Iristo was adequate and the vessel seaworthy.

▮ In Standard Oil Co. of New York v. Clan Line Steamers [1924] A. C. 100, a ship had been so constructed that when loaded with cargo she was unstable unless the water tanks were full. The shipbuilder had notified the owner of her instability under such circumstances, but the owner had not informed the master who pumped out the water tanks, whereupon the vessel capsized. It was held by the House of Lords that the vessel was unseaworthy unless the master understood her peculiar structure and characteristics so that he might have her tanks filled when she was loaded. It was also held that the neglect of the owner to give the master the necessary information, with the resultant loss, rendered the owner responsible. The fault was plainly that of the owner, while here the master was supplied with everything necessary for navigation and only his neglect caused the accident. Scrutton, L. J., whose judgment in a field like the present is of special weight, laid down the correct rule in Madras Electrical Supply Co. v. P. & O. Steam Navigation Co., 18 Ll. List. L. R. 93, as follows: "As I understand the authorities, a ship is not unseaworthy where the defect is such that it can be remedied on the spot and in a short time by materials available. The common case is a ship with an open port-hole. If the port-hole is a place where you can shut it at once, a ship is not unseaworthy because her port-hole happens to be open. If the port-hole is in a place where you cannot get at it during the voyage, and it is open, then the ship is unsea-

worthy. In the same way, I absolutely decline to hold that a ship is unseaworthy because there being the materials on board to be used for the purpose for which seaworthiness is required, the officers of the ship do not use the materials which are available."

The reasoning of Scrutton, L. J., applies to the present case and reconciles any supposed differences between the decisions of The Silvia, 171 U.S. 462, 19 S.Ct. 7, 43 L. Ed. 241, and International Navigation Co. v. Farr & B. Mfg. Co., 181 U.S. 218, 21 S. Ct. 591, 45 L.Ed. 830. The problem in such cases is whether the vessel on sailing was reasonably fit for navigation? We think, when she had Chart No. 360 and the Notices to Mariners on board that she was and, in any event, that the finding by Judge Conger of seaworthiness cannot be regarded as clearly erroneous.

The respondent has excepted to the clerk's refusal to tax separate docket fees against each of sixty-three libellants, parties to three different suits that were tried together on exactly the same issues. The clerk only allowed three docket fees and his ruling was sustained by the trial judge. We find no reason for disturbing the disposition of costs by the court below.

Decrees affirmed.