FIREMAN'S FUND INDEMNITY CO. v.
UNITED STATES (ROSASCO et al.,
third party respondents).
Nos. 366, 367 and 368.

United States District Court
N. D. Florida, Pensacola Division.
March 19, 1953.

See also, D.C., 103 F.Supp. 915.

Fisher & Hepner, Pensacola, Fla., for libellant.

Hayford O. Enwall, Ass't. U. S. Atty., Gainesville, Fla., for respondent.

DE VANE, Chief Judge.

These three cases, consolidated for trial, are suits in personam in admiralty by Fireman's Fund Indemnity Company, insurer of L. P. Schambeau Stevedoring Company against the United States to recover the total of the past and future compensation payments paid and to be paid to the dependents of a deceased stevedore in one case and to two injured stevedores, one of whom has died since the institution of these suits of causes not connected with his injuries; said stevedores being at the time of death and injuries employees of the L. P. Schambeau Stevedoring Company and

Rosasco Brothers. The compensation payments, past and prospective, were ordered paid by formal awards of a deputy commissioner of the 6th Compensation District, pursuant to the provisions of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. § 901 et seq.

In addition to the compensation payments libellant seeks to recover for the stevedores and their dependents any damages to which they might be entitled had they brought separate suits against the United States.

The United States impleaded the L. P. Schambeau Stevedoring Company and Rosasco Brothers and their trustees, as third party respondents.

The grounds upon which libellant bases its right to recover in these cases are allegations in its libels that the death and injury to the respective stevedores were occasioned by the negligence of the United States, acting through its officers and servants, aboard the USS Okaloosa on September 1, 1948, in failing to provide a "seaworthy" vessel and a safe place for the stevedores to work in the unloading of the lower section of the Number 4 hold. The specific allegation of the unseaworthy condition of the vessel is based upon the contention, variously phrased, that certain "toggle pins" intended for insertion into claw latches fastened to brackets near the forward and aft ends of the hatch wall were not in the place designated for them, but were missing and were not made available by the ship's personnel to the civilian stevedoring personnel for use to safely secure the hatch covers when it became necessary to raise them to continue the unloading of the lower hold of the vessel.

Libellant alleges that one of the hatch covers in Number 4 hold fell upon the three stevedores causing death to one and serious injuries to the other two.

The evidence bearing upon the issues raised by the pleadings in these cases is somewhat lengthy and in some respects in irreconcilable conflict. It will be briefly summarized below.

During September, 1948 a Joint Armed Force operation called "Combine III" was scheduled, certain phases of which were to take place at the Naval Air Station and auxiliary fields at Pensacola, Florida. On August 14, 1948 the Okaloosa was ordered to be available in Norfolk, Virginia on August 25, 1948 to load certain military supplies needed for the operation and then to proceed to Pensacola, Florida. It was directed, particularly, that she be unloaded within two days after arrival at Pensacola. This required the use of two shifts of stevedores while the Okaloosa was berthed at Pensacola. The Navy at Pensacola did not have sufficient personnel experienced in stevedoring work to operate two shifts and to comply with the required order to unload the vessel within two days, entered into a contract with L. P. Schambeau Stevedoring Company to do unloading after 4:00 P.M. each day with its own stevedoring personnel.

The Okaloosa docked at Pensacola on the morning of September 1, 1948 and the Navy personnel immediately began the unloading of the vessel and continued such unloading operations until 4:00 P.M. of that day when the Schambeau Company and Rosasco Brothers, an affiliate, took over completely the unloading activities. When Schambeau Company and Rosasco Brothers started work that afternoon the Navy personnel was in the process of unloading the upper level of Number 4 hold. Cargo completely covered the hatch to the lower level of this hold and had to be removed before the hatch covers could be opened.

The parties are in agreement that the Navy personnel informed appropriate personnel of Schambeau Company and Rosasco Brothers as to how these hatch covers worked, except that the testimony is not in agreement as to the extent of the explanation as to how they worked. The parties are in agreement, however, that when Schambeau Company and Rosasco Brothers took over no Navy personnel remained on duty to supervise or direct unloading operations and their stevedoring personnel were in complete charge of the unloading operations from that point on while they were engaged in such operations. The parties are in further agreement that Schambeau Company and Rosasco Brothers completed the unloading of the upper level

of Number 4 hold in approximately one hour after they took over and opened the hatch covers for the purpose of unloading the lower level. The process of unloading the lower level had proceeded only a short time when one end of the pallet of the sling, while being lowered into the lower hold, became unfastened, striking one of the hatch covers, causing it to fall on the employees in the lower level of the hold, killing one and severely injuring two.

The conflict in the testimony centers around the question as to why the hatch covers were not securely fastened when they were opened. The evidence is not in conflict as to how they could have been made secure, but as to why they were not made secure. The evidence shows that when the hatch covers were opened they were supposed to be made secure by two devices, either one of which, under ordinary circumstances, would be sufficient to hold the covers open. Each cover was provided with two claw latches, attached to the side wall of the upper hold. These claw latches fit over the covers and onto brackets attached thereto, through which toggle pins, or bolts, were supposed to be inserted, making the claw latches securely fastened to the covers. In addition to this safety device the covers had cables attached to them which were used in raising the covers and which could be tied together for additional support after the covers had been opened and held in place by the claw latches.

The design of the ship called for the toggle pins, intended to be used to hold the claw latches in place, to be fastened to a chain which hung on the wall next the claw latches. No toggle pins were so attached. The testimony of respondents' witnesses is to the effect that they had found it impossible to keep toggle pins in the chains as they were knocked loose during the loading or unloading operations and other bolts had been provided for the purpose and were available. They were, however, kept in a different place and the testimony of the stevedoring personnel is that they searched for the bolts, were unable to find them, and called out to some Navy employee on the deck of the ship asking if it was safe to proceed with unloading without securing the claw latches to the covers with bolts, and were advised that it was safe to do so. No one was able to identify the Navy person these employees claim was present when the question was asked and assurance given. The stevedoring personnel admitted they did not use the cables to secure the covers and claimed they did not understand they were intended for such use.

The question of respondent's liability in these cases depends primarily upon the testimony of the witnesses concerning the reason for the failure of the stevedoring personnel to properly secure the hatch covers before proceeding with their work of unloading the lower part of Number 4 hold. The conflict in the testimony bearing upon this question is of no great importance in determining respondent's liability and the court's inability to reconcile it does not make it difficult to decide the question the court is compelled to decide on this issue. It is the opinion of the court that the absence of the toggle pins from the chains designed to hold them did not render the vessel unseaworthy, because the evidence shows that the vessel did have aboard the necessary bolts or pins to hold the claw latches in place. In that respect these cases differ from the numerous cases relied upon by proctor for libellant, including Caswell v. Sanford, a case recently decided by this court and affirmed by the Court of Appeals, 5 Cir., 200 F.2d 830. In that case a ladder which was a necessary part of the ship's tackle, was not aboard the vessel, rendering the vessel unseaworthy. In these cases the necessary bolts were aboard ship and following the accident and before the work of unloading the vessel was resumed, were made available for the purpose of securing the claw latches to the hatch covers. The court finds from the evidence in these cases that the Okaloosa was seaworthy on the date of the accident involved in these cases. Middleton & Co. v. Ocean Dominion SS Corp., 2 Cir., 137 F.2d 619; The Smyrna, 4 Cir., 62 F.2d 1048.

The next question posed by the pleading and evidence in the cases is whether respondent was guilty of negligence in

failing to provide the necessary safety bolts or pins to hold the claw latches in place. The Navy personnel was fully aware that no toggle pins were on the chains near the hatch. They were also aware that toggle pins or similar bolts were necessary to make the hatch covers secure when raised to permit the unloading of the lower hold. The bolts intended for use in place of the toggle pins to hold the claw latches in position were located at a point on the vessel where they were not readily accessible to the stevedoring personnel. It therefore became the duty of the Navy personnel to make these bolts available to the stevedoring personnel when the unloading operations were turned over to them. They well knew, and so testified, that it would be unsafe for the stevedoring personnel to proceed without the use of those bolts to make the hatch covers secure.

■ Proctor for respondent contends that the danger of attempting to unload the lower level of Number 4 hold without the use of toggle pins or other bolts to hold the claw latches in place was so obvious to the stevedoring personnel that respondent should not be held at fault in any respect in this regard. In support of this contention he cites, U. S. v. Arrow Stevedoring Co., 9 Cir., 175 F.2d 329. While the similarity in the facts in this case just cited and these cases is sufficient to make it appear that the vessels were of the same design the court is unwilling, on the facts of these cases, to hold respondent free from fault as was done in that case. For the reason the Navy personnel failed to provide the necessary bolts for use in making the hatch covers secure when raised, the court holds respondent guilty of negligence.

The court also has before it, in these cases, the question of whether the third party respondents were also guilty of negligence. The evidence shows that the third party respondents were experienced stevedores; had been engaged in stevedoring work for many years and that the foreman in charge of the unloading of Number 4 hold had more than twenty years' experience in stevedoring work. He should have known, and the evidence indicates he

did know, that it was unsafe to begin the unloading of the lower hold until the hatch covers had been securely · fastened. The evidence in these cases convinces the court that he had no right to rely upon a statement he claims was made to him by some unknown and unidentified person that it was safe to proceed with the unloading without the use of the bolts to secure the hatch covers. The failure of the stevedoring personnel to call upon the ship's personnel for the necessary bolts to hold the hatch covers in position safely renders the third party respondents guilty of negligence in these cases.

■ Libellant was the insurer of the third party respondents under the Longshoremen's and Harbor Workers' Compensation Act and its liability in these cases arises out of its contract with the third party respondents. It, therefore, follows that if the third party respondents have no right of recovery against respondent in these cases the libellant has none. The court has already found and held the third party respondents guilty of negligence and upon the authority of Halcyon Lines v. Haenn Ship Ceiling & Refitting Corp., 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318, there is no liability over from respondent to the third party respondents. See also, Lynch v. United States, 2 Cir., 163 F.2d 97 and Fogel v. United States, D.C., 102 F.Supp. 727. The Longshoremen's and Harbor Workers' Compensation Act gives to libellant no greater right of recovery than that given to the third party respondents. Anything that defeats their right to recover also defeats the right of their insurer to recover. Eagle Indemnity Co., to Use of Beal v. U. S. Lines Co., D.C., 86 F.Supp. 949.

■ In these cases there is an additional reason defeating libellant's right to recover. At the time the third party respondents were engaged as stevedores to assist in the unloading of the Okaloosa a verbal contract was entered into between the parties, which, because of the shortness of time, was not reduced to writing and executed until the unloading had been completed. The contract was, however, placed in final form

and executed by the parties on September 3, 1948. This contract contained the following provision:

"As old age benefits, workmen's compensation, state's unemployment benefits, and public liability insurance rates are included in the hourly rate specified herein, all liability for damage or injury to persons or property resulting from the performance· of this contract is assumed by the contractor."

After the execution of this contract a dispute arose as to the meaning of the above quoted provision and the Naval officer executing the contract on behalf of respondent wrote the third party respondents a letter which contained the following statement:

"This is not our understanding of the quoted language, as it is our construction of the quoted language that you are only obligated as you state. However, since the written contract was not drawn until after the completion of the work, and since it is not now practical to change the contract as drawn, this letter is being directed to you as a clarification and/or modification of the written contract, and we hereby agree with you that your obligation in this regard is by your contract limited to pay all old age benefits and unemployment benefits on your employees, maintain workmen's compensation insurance on your employees, and carry contractor's public liability insurance to cover damage to Government property, or injury or damage to third persons caused by your negligence, or that of your employees, and not otherwise."

A great deal of the argument of proctors for the respective parties has centered around the above quoted language of the contract and the meaning and effect of the explanatory letter referred to above. Proctor for libellant contends that the provision of the contract is ambiguous and must be construed along with the letter. Proctor for respondent contends that the provision of the contract is unambiguous and that the letter is without any legal force or effect as the Naval officer writing it was without authority to modify a contract already executed by the parties and in effect.

It is the opinion of the court that the controverted point is immaterial. The contract, in its original language, and the letter explaining the contract made the third party respondents liable for damage or injury to persons or property caused by the negligence of the third party respondents or their employees. The court has found and held that the third party respondents were guilty of negligence, which, under the terms of the contract and the explanatory letter, makes them, and not respondent liable for all damages claimed in these suits. Libellant announced during the course of the trial of these cases that it had no right to recover against the third party respondents and that if it had no right of recovery against respondent it had no right of recovery in these cases.

The court, therefore, holds that libellant has no right of recovery in these cases.

A final decree will be entered in conformity with this memorandum decision.