**FIREMAN'S FUND INDEMNITY CO.**

v.

**UNITED STATES.**

No. 14652.

United States Court of Appeals
Fifth Circuit.

March 31, 1954.

Rehearing Denied May 14, 1954.

Wm. Fisher, Jr., Fisher & Hepner, Pensacola, Fla., for appellant.

Hayford O. Enwall, Asst. U. S. Atty., Gainesville, Fla., Harrold Carswell, U. S. Atty., Tallahassee, Fla., for appellee.

Before STRUM and RIVES, Circuit Judges, and DAWKINS, District Judge.

STRUM, Circuit Judge.

Three longshoremen were injured, one fatally, when a heavy steel hatch cover fell on them while unloading the No. 4 lower hold of a Navy cargo vessel, the U.S.S. Okaloosa, at Pensacola, Florida, on September 1, 1948.

Appellant, Fireman's Fund Indemnity Company, libellant below, was the insurance carrier of the stevedoring firm employing said longshoremen. Having paid to date the compensation awards made under the Longshoremen's Act[1] to the injured employees and their dependents, appellant instituted these libels *in personam* to recover from the United States all sums paid by libellant on account of such awards, and, as subrogee,[2] all sums to which the longshoremen, or their dependents, may be entitled as damages. Libellant asserts that the injuries were caused by the unseaworthiness of the vessel in the respect hereinafter stated, and that the United States was negligent in failing to use due care to provide a reasonably safe place for the longshoremen to work. The trial court entered judgment for respondent, 110 F.Supp. 937, and libellant appeals.

The vessel is a converted Victory class cargo carrier built during World War II. The lower No. 4 hold has two steel hatch covers, port and starboard, each measuring about 8 x 14 feet and weighing upwards of two tons. Each cover is hinged near the vessel's center line so that it can be pulled up into a perpendicular position in order to open the hatches. When fully open, the two covers stand back to back, about five feet apart, extending fore and aft, resting in a perpendicular position on their inboard edge which is attached to the hinge.

These covers are raised into an open position by a steel cable running from a deck winch up over a cargo boom and down to the hatch. The hoisting cable is attached to the hatch cover by a short length of steel cable called a "strap," having an "eye" in each end, one end of

1. 33 U.S.C.A. § 932.

2. 33 U.S.C.A. §§ 933(b) and 933(e) (2), (i).

which is shackled to a "pad-eye"[3] attached to the outboard side of the hatch cover. The other end of the "strap" is attached by a shackle to the hook on the end of the cargo hoist, and the cover thus raised by the deck winch. When the hatch cover has been opened, the "strap" is detached from the cargo cable but remains securely attached to the "pad-eye" in the hatch cover at all times.

There are two ordinary methods of holding the covers in an upright or open position. One is by "L" shaped metal latches attached by a pivot to stationary brackets on the fore and aft bulkheads of the hatch well, so that the hooked end of the latches can be moved up or down several inches, thus engaging or releasing the hatch covers. One of these latches fits over each end of the hatch cover. The latches are ordinarily secured in place, so that they will not jar loose, by a small toggle pin which is inserted through a hole in the latch and on into a corresponding hole in the stationary bracket attached to the bulkhead. These toggle pins are normally attached to a short length of chain, which is in turn attached to the bulkhead near the hole where the toggle pin is to be used.

Another method customarily used to secure the open hatch covers is to tie together the two steel wire "straps" attached to the "pad-eye" on each cover. The "pad-eye" being on the upper side of the cover when it is open, this method will also secure the hatches against accidental closing.

The cargo hoist passing up and down the hatch well had frequently torn loose the toggle pins and they were missing much of the time, so that it had become standard practice for the crew of the vessel to use stove bolts with a nut on the end to secure the latches, which was found to be even more satisfactory than the toggle pins. At the time of the accident no toggle pins were available, but a supply of stove bolts such as used by the ship's crew, was laid out ready for use on the deck just above No. 4 lower hold, to the left of the personnel entrance to the hatch trunk, within a few feet of the latches.

On the day in question, the crew of the vessel had worked cargo out of No. 4 upper hold until 4:00 p. m., when the Navy crew knocked off, and the civilian crew, employees of the Schambeau Company, the stevedores, took complete and exclusive control of the work, and of that part of the ship, as independent contractors.

When the civilian crew took over, the first lieutenant of the ship, who is in charge of the ship's equipment, told the contracting stevedore that he, the first lieutenant, would be aboard all night and if the stevedores had any problem with any of the gear to get hold of him or one of the boatswain's mates and they would supply whatever was needed. No such request was made.

About 5:00 p. m., the civilian crew finished unloading No. 4 upper hold, and opened the hatch covers to No. 4 lower hold in order to unload the latter. They pulled the two steel hatch covers into a vertical position and put the metal "L" latches down over the ends of the hatch covers, but did not secure the latches with bolts, claiming they could not find the latter. Neither did they secure the hatch covers by tying together the two steel "straps" at the top, though the "straps" were attached to the hatch covers and readily available.

About 5:30 o'clock, a wooden "pallet" coming back aboard the vessel in an empty cargo sling fell out of the sling and struck the starboard hatch cover, causing the latches on that cover to "kick up," and the hatch cover fell on the three longshoremen working on top of the full cargo hold just beneath, with the results already stated. After the accident, the hatch covers were reopened, the stove bolts were found, the latches were secured with them, and the steel "straps" at the top of the hatch covers were also tied together.

---

3. A flat metal plate securely fastened to the hatch cover, with an "eye" in it into which the shackle bolt is inserted.

A situation substantially identical with this was considered by the Ninth Circuit in United States v. Arrow Stevedoring Co., 175 F.2d 329, also page 333, involving the U.S.S. Edgecomb, a cargo ship of the type here involved, equipped with the same type of hatch covers as these, one of which fell and injured two employees engaged in unloading No. 4 port lower hold, because the hatch cover was not properly secured against falling. The Ninth Circuit held that the sole proximate cause of the injuries was the negligence of the stevedores in using the hatch covers with knowledge that they were not secured by safety devices and were likely to fall.

In this case, the district judge found the United States guilty of negligence in failing to provide the necessary toggle pins or other bolts with which to secure the hatch covers in an upright position, but held that the stevedore company was also guilty of negligence, which would preclude recovery by libellant.

■ There is an absolute, continuing and non-delegable duty on the part of the ship owner to keep the vessel seaworthy and to use due care to provide a reasonably safe place to work for those employed aboard the vessel, including stevedores and longshoremen: Sea Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099. In our opinion the United States has here met these requirements.

■ Absence of the toggle pins did not in these circumstances render the ship unseaworthy because other adequate and suitable means of securing the latches, and of holding the hatch covers erect, were readily available. Middleton & Co (Canada), Limited v. Ocean Dominion S. S. Corp., 2 Cir., 137 F.2d 619; The Smyrna, 4 Cir., 62 F.2d 1048. Though the evidence is not free from conflict, there is strong and persuasive evidence that an adequate supply of stove bolts and nuts with which to secure the latches, such as were customarily used by the vessel's crew, was laid out on the deck over No. 4 hold inside the hatch trunk, and within a few feet of the latches themselves, where they could have been readily found and put to use by the stevedores.

There is also persuasive evidence that the ship's first lieutenant told the boss stevedore the bolts were there, and explained how to use them in lieu of the toggle pins. Of course the stove bolts were not visible at the moment, as there was still cargo on the floor of the upper hold, but this cargo was removed before the lower hold was opened.

But if there be doubt as to the bolts, there is none that the hatch covers could have been easily and effectively lashed securely in place by the steel lifting straps shackled to the outboard side of each hatch cover, which became the upper side when the hatch covers were opened, a method with which experienced stevedores are fully familiar. After the accident, the hatch covers were reopened, and the stove bolts were found on the deck where the ship's first lieutenant said he told the boss stevedore they would be found. They were then put in place on the latches. The steel lifting straps were also found shackled to the hatches. The hatches were then lashed together with them, as should have been done in the first place, and the work of unloading proceeded safely. While there are also conflicts in the evidence as to the "straps," we think they were correctly resolved by the district judge.

■ These were experienced stevedores, the civilian foreman on this job having been stevedoring for twenty years. It was obvious that these hatch covers, when standing in an upright position, were dangerous unless properly secured against falling, which the foreman well knew.[4] The United States in no way participated in the negligent use of the hatch covers. Their negligent use

---

4. When the hatch covers were first opened and the latch put in place but not secured, one of the stevedores remarked to the foreman: "This here don't look like it is going to hold here. * * * It seems mighty slack, it looks mighty bad to me."

by the stevedores in failing to properly secure them, when the equipment for that purpose was readily available, was the sole proximate cause of the longshoremen's injuries. This is another case, such as The Aden Maru, D.C., 51 F.2d 599, where serious, and fatal, injuries on shipboard have been suffered by employees of an experienced contracting stevedore because a culpably negligent and dangerous method of performing his work was voluntarily and consciously chosen by the stevedore, and voluntarily participated in by the injured longshoremen, when a safe method was at hand, the work being under the exclusive control of the stevedore making the choice. See also United States v. Arrow Stevedoring Co., supra; Lauro v. U. S., 2 Cir., 162 F.2d 32; Lynch v. U. S., 2 Cir., 163 F.2d 97; Grasso v. Lorentzen, 2 Cir., 149 F.2d 127; Whyatt v. U. S., D.C., 92 F.Supp. 543; Signore v. The Ferngulf, D.C., 103 F.Supp. 677.

As adequate and suitable means of preventing the hatch covers from falling were provided, the United States is thereby exonerated of both the charge of unseaworthiness and the charge of negligence, as both charges rest upon the alleged absence of means with which to prevent the hatch covers from falling. It is because of the availability of these adequate and suitable substitutes that this case differs in principle from Sanford v. Caswell, 5 Cir., 200 F.2d 830, in which this court affirmed the district judge who decided the present case, in holding the vessel unseaworthy because of the entire absence of a ladder by which to board the vessel from the dock, which resulted in injury to one of the crew.

As the sole proximate cause of the injuries here was the negligence of the contracting stevedores, and as unseaworthiness of the vessel has not been established, the United States is not liable. This being so, it is unnecessary to discuss the contract of indemnity executed by the stevedores to the United States.

Affirmed.